# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| WESCO, INC., Trustees of the UTILITY WORKERS UNION OF AMERICA NATIONAL HEALTH AND WELFARE FUND, together, on behalf of themselves and a class of all other similarly situated persons, | Case No.:<br><br>Hon. |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................1

PARTIES, JURISDICTION, VENUE, AND INTERSTATE COMMERCE ....7

FACTUAL ALLEGATIONS ..............................................................11

      A.    RELEVANT HISTORICAL BACKGROUND OF BCBSM ...................11

      B.    OVERVIEW OF COMMERCIAL HEALTH INSURANCE IN MICHIGAN ......................................................................22

      C.    PLAINTIFFS ENGAGED BCBSM TO SERVE AS THEIR TPA AND STOP-LOSS INSURER .......................................................30

      D.    RELEVANT MARKETS ...................................................35

      E.    BCBSM'S MARKET POWER ...........................................41

      F.    BCBSM'S UNLAWFUL CONDUCT ....................................46

      G.    ANTICOMPETITIVE EFFECTS OF BCBSM'S CONDUCT ...............50

      H.    BCBSM'S PENALTY FEE CAUSED ANTITRUST INJURY AND DAMAGES TO PLAINTIFFS AND THE CLASS ..................................60

      I.    CLASS REPRESENTATION ALLEGATIONS .....................................62

COUNT I: AGREEMENT IN RESTRAINT OF TRADE – SHERMAN ACT § 1 ..........................................................................67

COUNT II: UNLAWFUL AGREEMENT IN VIOLATION OF MCL 445.772 – MICHIGAN ANTITRUST REFORM ACT ......................................70

PRAYER FOR RELIEF ......................................................................71

PLAINTIFFS' DEMAND FOR JURY TRIAL ....................................................74

Plaintiffs Wesco, Inc. ("Wesco") and the Trustees of the Utility Workers Union of America National Health and Welfare Fund ("UWUA Fund") (collectively, Wesco and the UWUA Fund hereinafter referred to as the "Plaintiffs") on behalf of themselves and all others similarly situated, through their counsel, Varnum LLP, Bailey & Glasser, LLP, and Watkins, Pawlick, Calati & Prifti, PC, bring this action against Defendant, Blue Cross Blue Shield of Michigan Mutual Insurance Company ("Defendant" or "BCBSM").  Plaintiffs hereby allege as follows:

## **INTRODUCTION**

1.     This is a putative class action for unlawful restraint of trade resulting from BCBSM's ploy to reduce competition in the Michigan health insurance industry in violation of federal and state antitrust laws.

2.     Specifically, BCBSM uses and leverages its monopoly power in the Michigan third-party administrative services market for Self-Funded Accounts[1] to increase its market power and/or reduce competition in the separate stop-loss insurance market by illegally tying and/or bundling the purchase of stop-loss insurance with the sale of its third-party administrative services via the imposition of an unlawful, punitive, and anticompetitive fee on its customers.

3.     Plaintiffs, like the Class Members, sponsor and/or operate a Self-

---

[1] Certain Defined Terms are included in the Appendix—Glossary of Terms attached to the end of this Complaint.

1

Funded Account that has purchased and/or established a Self-Funded Health Benefit Plan for their employees and/or their families and dependents.

4. This means that the Plaintiffs, and Class Members themselves generally assume the financial responsibility and risk associated with paying for the health care costs and claims incurred by the individuals and/or their families and dependents who are enrolled in the plan (i.e., the plan's members), rather than an insurance company.

5. While Self-Funded Accounts can administer the medical claims which they are responsible to pay for themselves, many, like Plaintiffs and the Class Members, choose to enter into administrative services only ("ASO") or administrative services contracts ("ASC") with a third-party administrator ("TPA"), like BCBSM, who agrees to administer and coordinate the medical claims on behalf of the Self-Funded Accounts' health benefit plan.

6. To protect themselves against catastrophic medical claims if any of their enrollees' medical costs exceed a specified amount in any given year, Plaintiffs, and the Class Members, also purchase stop-loss insurance as a form of reinsurance.

7. On information and belief, on or around January 1, 2011, BCBSM began imposing an anticompetitive fee on all its Self-Funded Account customers who engage BCBSM for third-party administrative services (e.g., claims administration and network access) via ASO or ASC agreements but who may wish

to purchase stop-loss insurance coverage from a BCBSM rival (referred to hereafter as BCBSM's "Penalty Fee").

8.    In particular, BCBSM instituted a $4 Penalty Fee on a **per contract per month** ("PCPM") basis for all of its Self-Funded Account customers, like Plaintiffs and the Class Members, who entered into ASO or ASC agreements with BCBSM for TPA services if they purchased stop-loss policies from BCBSM's rivals.

9.    A PCPM basis means that BCBSM's Self-Funded Account customers, like Plaintiffs and the Class Members, would be charged a $4 fee **per each individual health benefit contract the Self-Funded Account has for its employees and/or enrollees**.  In other words, a $4 fee charged on a PCPM basis for a Self-Funded Account that has 1,000 enrollees/employees participating in the account's health benefit plan would pay BCBSM the sum of 1,000 multiplied by $4 ($4,000), *per month*.

10.    Over the years, BCBSM has increased its Penalty Fee for many of its customers to the point that, as of today, most of BCBSM's Self-Funded Account customers have a Penalty Fee of at least $8 PCPM.  While some Self-Funded Account customers may have a lower Penalty Fee in their ASO or ASC agreements with BCBSM, on information and belief, these accounts are the exception and none of them is lower than $4 PCPM.

11.     From the start, BCBSM's Penalty Fee was never meant to cover any administrative expenses.

12.     In fact, BCBSM has no incremental cost justification for its Penalty Fee, particularly one charged on a PCPM basis.

13.     BCBSM's Penalty Fee is nothing more than a phantom tax that BCBSM has anticompetitively imposed on the Michigan stop-loss insurance market; and more specifically on stop-loss policies sold by its rivals to serve as a barrier to entry into the Michigan stop-loss insurance market, preclude competition, weaken rivals' ability to compete, and cause other anticompetitive effects while maintaining or growing its monopoly power in the TPA Market and its market power in the Stop-loss Market.[2]

14.     BCBSM's Penalty Fee was implemented to serve as a deterrent and discourage BCBSM's self-funded customers from buying stop-loss coverage from other carriers while simultaneously weakening its rivals competitively by effectively raising the prices of their stop-loss products.

15.     As a result of BCBSM's unlawful Penalty Fee, the effective prices of stop-loss insurance for Self-Funded Accounts are significantly higher than they otherwise would be in Michigan.

---

[2] TPA Market and Stop-loss Market are further defined below in ¶¶ 159-160, 171-172.

16.    In that sense, BCBSM's Penalty Fee is also substantively no different than a price fixing scheme explicitly designed and employed to raise its rivals' costs in violation of federal and state antitrust laws.

17.    BCBSM's unlawful tying and/or bundling arrangement has resulted in several anticompetitive effects to be discussed in further detail below but, at their highest level, can be described as follows.

18.    *First*, it has substantially foreclosed competition in Michigan's stop-loss insurance market, including, but not limited to, keeping BCBSM's actual competitors' market shares at levels too low to constrain BCBSM from charging prices to self-funded customers above those expected in a competitive market.

19.    *Second*, it has weakened the competitive status of BCBSM's rivals while protecting, maintaining and increasing BCBSM's market power in the Stop-loss Market.

20.    *Third*, it has raised entry barriers in the Stop-loss Market as potential entrants had to be fully aware of BCBSM's use of its Penalty Fee to target its rivals.

21.    *Lastly*, it has generated a cost-free revenue stream for BCBSM that bears no relationship to actual costs incurred by BCBSM when serving as a Self-Funded Account's third-party claims administrator and coordinating claims reports under a stop-loss insurance policy purchased from a BCBSM rival.

22.     Indeed, upon information and belief, the present Penalty Fee for most Self-Funded Accounts is well over four times BCBSM's alleged costs and there are no legitimate procompetitive benefits for BCBSM's Penalty Fee being over four times its perceived costs.

23.     Threatened by this unavoidable and increasing tax, BCBSM rivals understandably have less, if any, incentive to engage in the competitive pricing that characterized the stop-loss insurance market prior to BCBSM imposing its Penalty Fee in connection with its TPA services.

24.     Plaintiffs seek to represent a Class of all Self-Funded Accounts that have, since November 8, 2020: (1) engaged BCBSM as their third-party administrator via an ASO or ASC agreement, purchased stop-loss coverage from a BCBSM rival, and paid the Penalty Fee; or (2) engaged BCBSM as their third-party administrator via an ASO or ASC agreement and purchased stop-loss insurance coverage from BCBSM.

25.     Because BCBSM's unlawful conduct, as described herein, has caused antitrust injury and damages to Plaintiffs and the proposed Class in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act ("MARA"), MCL 445.772, Plaintiffs seek to recover treble the amount of monetary damages resulting from BCBSM's anticompetitive conduct, including but not limited to actual damages suffered by Plaintiffs and the Class Members in

6

paying artificially inflated and/or higher prices for stop-loss insurance, and/or damages determined by the inflated profit BCBSM received by being paid the Penalty Fee.

26. Furthermore, Plaintiffs and the Class Members seek injunctive relief to enjoin BCBSM from engaging in the anticompetitive conduct alleged herein, and recovery of all costs and attorneys' fees as permitted by federal and state antitrust laws, among any other relief that this Court finds proper and just.

## PARTIES, JURISDICTION, VENUE,
## AND INTERSTATE COMMERCE

27. Wesco, a 55-year-old family-owned and operated chain of gas station convenience stores, is a Michigan corporation with its principal place of business located at 1460 Whitehall Road, Muskegon, Michigan 49445.

28. Wesco is in the business of operating gas station convenience stores throughout the state of Michigan.

29. Wesco employs approximately 1,600 employees spanning at least seven counties in Michigan and has sponsored during the past 21 years, and continues to sponsor, a Self-Funded Account that has purchased, subscribed to, and/or enrolled in a Self-Funded Health Benefit Plan for its employees and their families and/or dependents. Approximately 260 of Wesco's employees have enrolled in Wesco's Self-Funded Health Benefit Plan.

30.    The UWUA Fund is a Board of Trustees and fiduciary of the Utility Workers Union of America National Health and Welfare Fund, which is a jointly administered, multi-employer benefit fund.    Since 2016, the UWUA Fund has sponsored, and continues to sponsor, a Self-Funded Account that has purchased, subscribed to, and/or enrolled in a Self-Funded Health Benefit Plan for its members and their families and/or dependents.

31.    The UWUA Fund maintains its principal office and place of business in Bloomington, Minnesota.

32.    Defendant, BCBSM, is a nonprofit mutual insurance company who operates under Chapter 58 of the Michigan Insurance Code, MCL 550.1101, *et seq*, with its principal place of business located at 600 E. Lafayette Blvd., Detroit, Michigan 48226.

33.     BCBSM is the exclusive licensee and health insurance plan operating under the Blue Cross Blue Shield trademarks and trade names in the state of Michigan.

34.    BCBSM underwrites, sells, and administers various health benefit plans and policies of health insurance, including stop-loss insurance for self-funded plans. It also holds itself out as providing services to a variety of health benefit plans, such as third-party claims administrative services and access to various networks of medical care providers.

8

35.     BCBSM is the largest health insurer, as measured by number of subscribers or enrollees, in Michigan and does business in each county in Michigan. BCBSM is also the largest stop-loss insurance provider and third-party claims administrative service provider in the State of Michigan.

36.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' and the Class Members' federal claims arise under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26.

37.     This Court has supplemental jurisdiction over Plaintiffs' and the Class Members' state-law claims under 28 U.S.C. § 1367 because they arise from a common nucleus of operative facts and are so related that they form part of the same case or controversy.

38.     This Court has personal jurisdiction over BCBSM because BCBSM is subject to the jurisdiction of a court of general jurisdiction in Michigan: BCBSM resides or may be found in this district.  Further, this Court has personal jurisdiction over BCBSM because a substantial portion of the wrongdoing and anticompetitive conduct alleged in this Complaint took place in the State of Michigan; BCBSM is authorized to do business in Michigan; BCBSM conducts business in Michigan and in the Eastern District of Michigan; BCBSM advertises and promotes its services in

the State of Michigan and this District; and BCBSM otherwise intentionally markets and sells insurance and related products and services in Michigan.

39.    Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) because BCBSM resides in the Eastern District of Michigan and a substantial part of the events, transactions, and omissions giving rise to the claim occurred in the Eastern District of Michigan.

40.    This action is further brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

41.    BCBSM is engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce. Among other things, increased prices for stop-loss insurance and third-party administrative services caused by BCBSM's penalty Fee, may in some cases, be paid by Self-Funded Accounts across state lines. Furthermore, BCBSM: (a) provides administrative services and stop-loss insurance to Self-Funded Accounts that cover individual enrollees when they travel across state lines; (b) administers and pays claims when Michigan residents require health care out of state; and (c) otherwise receives payments from Self-Funded Accounts who may reside outside of Michigan but are paid on behalf of Michigan residents.

## FACTUAL ALLEGATIONS

42.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs.

### A.     RELEVANT HISTORICAL BACKGROUND OF BCBSM.

#### 1.     The Blue Cross and Blue Shield Empire.

43.     BCBSM is a nonprofit mutual insurance company that was founded in 1939.

44.     It is the largest nonprofit mutual health insurer in Michigan, serving approximately 6.1 million people.

45.     The Blue Cross and Blue Shield empire is the largest and oldest provider of prepaid health care coverage throughout the U.S.

46.     Blue Cross and Blue Shield were originally two separate and independent organizations providing insurance coverage for different medical care expenses.

47.     Blue Cross covered hospital expenses, outpatient, and home care services, whereas Blue Shield initially was established to cover physician services.

48.     Eventually in or around 1982, Blue Cross and Blue Shield merged into a joint association, known as the Blue Cross Blue Shield Association ("BCBSA"), a not-for-profit entity incorporated in Illinois.

49.     Because the BCBSA was created as a trade association, it is neither the

11

parent nor guarantor of any contractual commitments of any individual Blue Cross and Blue Shield affiliated company, like BCBSM.

50.     Instead, the BCBSA serves mainly as a coordinating agency for health care coverage, claims processing, and other administrative tasks among the 30+ individual local or state Blue Cross Blue Shield affiliated companies throughout the United States.

51.     Importantly, when BCBSA was formed it became the sole owner of the various Blue Cross and Blue Shield trade names and trademarks that were previously owned by the individual local or state plans.

52.     In order to keep using the Blue Cross and Blue Shield trade names and trademarks (the "Blue Brand"), all of the various local and state plans agreed to consolidate, ensuring that each state or region would only have one Blue Cross Blue Shield licensee of the Blue Brand.

53.     Further, each respective local licensee, including BCBSM, was required to sign a license agreement with BCBSA (and commit to other contractual obligations) that restricted any licensee from using the Blue Brand outside their prescribed service area to prevent competition among plans using the Blue Brand.

54.     BCBSM is the exclusive licensee authorized to sell its products and services under the Blue Brand in the state of Michigan.

55.     BCBSM is one of the largest of the 34 independent-licensed members of the BCBSA, and is the eighth largest health insurance company in the United States in 2024.[3]

56.     With $36.3 billion in enterprise revenue in 2023, BCBSM is also the largest health insurer in Michigan.

57.     Directly, and through its subsidiaries, BCBSM provides health insurance, stop-loss insurance, and a combination of administrative services and network access, including preferred provider organization ("PPO") products and health maintenance organization ("HMO") products.

58.     Blue Care Network ("BCN"), a BCBSM subsidiary since 1998, operates and serves as the entity who offers BCBSM's HMO plans for group plans and manages some ASO agreements.

59.     As of July 1, 2014, BCBSM also began to write stop-loss coverage for self-insured customers of BCN Service Company (a subsidiary of BCBSM's HMO subsidiary, Blue Care Network).  Under this arrangement, BCN Service Company administers the medical and/or pharmacy coverage while BCBSM administers (and assumes the risk for) only the stop-loss coverage.

---

[3] Chris Kissell & Les Masterson, *Largest Health Insurance Companies in 2024*, FORBES (Feb. 26, 2024), https://www.forbes.com/advisor/health-insurance/largest-health-insurance-companies/.

## 2.    BCBSM's Anticompetitive History.

60.    Despite claiming to be a "nonprofit," BCBSM consistently acts as a for-profit company by continually holding massive excess surplus levels built off the net income derived from, among other sources, the premiums, ASO/ASC fees, stop-loss fees, and other administrative fees BCBSM collects from self-funded plans—such as its Penalty Fee.

61.    Indeed, many BCBSM executives have taken exorbitant bonuses out of such excessive surpluses at the cost of higher premiums and fees imposed upon self-funded plans, such as those established by Plaintiffs and the other Class members defined below.

62.    For example, "[t]otal all-cash compensation for CEO Daniel Loepp, 65, was $16.9 million in 2022. Of that amount, $13.8 million was Loepp's bonus and $1.7 million his base salary. His total compensation was up $1.3 million from the year before, although still below Loepp's record $19.2 million payday in 2018."[4]

63.    BCBSM often claims this surplus is designed as insurance reserves for future payments.

64.    But, as evident by BCBSM's conduct over the last few decades, such

---

[4] JC Reindl, *Michigan Blue Cross CEO Daniel Loepp earned $17M in cash in 2022*, DETROIT FREE PRESS (Mar. 2, 2023), https://www.freep.com/story/money/business/2023/03/01/michigan-blue-cross-ceo-daniel-loepp-earnings-2022/69958779007/.

surplus is more often used: (a) as strategic monies to develop and implement anticompetitive schemes to sift more money for itself (and its executives) from its customers, including Self-Funded Accounts; (b) to grow and maintain its monopoly power in the health care markets throughout the State of Michigan; and (c) to continuously carry out lobbying efforts aimed at maintaining and protecting its market dominance in the State of Michigan.

65.     The Penalty Fee at issue in this case is no different.

66.     In fact, over the last decade, BCBSM has been named as a defendant in numerous antitrust class actions and numerous other lawsuits arising out of BCBSM's various schemes to sift more money for itself, grow and maintain its monopoly or market power, charge impermissible fees, and otherwise restrain competition at the expense of its customers, including Self-Funded Accounts.

67.     Antitrust lawsuits against BCBSM began in 2010, when the United States Department of Justice ("DOJ") and the State of Michigan first filed suit to prohibit BCBSM from using its most favored nations clauses ("MFNs") in its contracts with hospitals and other health care providers in the State of Michigan.

68.     Specifically, the DOJ and State of Michigan alleged that BCBSM's MFNs violated state and federal antitrust laws because they required hospitals and health care providers to either charge BCBSM no more than what they charged BCBSM's rivals, or to charge BCBSM's competitors more than what they charge

15

BCBSM, which in some cases amounted to BCBSM's competitors being charged 30% more.

69.    As a result, BCBSM's use of such MFN provisions: (a) reduced competition in the sale of health insurance in Michigan by raising hospital costs for BCBSM competitors; and (b) discouraged other health insurers from entering into or expanding in markets throughout Michigan.   *See U.S. and State of Michigan v. Blue Cross Blue Shield of Michigan*, United States District Court for the Eastern District of Michigan, Case No. 2:10-cv-14155.

70.    Shortly after the DOJ antitrust suit was filed in 2010, BCBSM was also named as a defendant in a class-action suit in the United States District Court for the Eastern District of Michigan similarly alleging that BCBSM's use of its MFNs with 70 general acute care hospitals in Michigan violated federal and state antitrust laws and resulted in inflated prices for medical care and services at such hospitals causing harm to individual consumers, insurers, and self-insured entities who paid claims on behalf of participants that received healthcare services at such hospitals.   *See The Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, United States District Court for the Eastern District of Michigan, Case No. 2:10-cv-14360.   BCBSM settled this matter on June 23, 2014 (amended by that Amended Class Action Settlement Agreement on October 11, 2016) for $29.9 million.

71.     Around the same time that *The Shane Group* complaint was filed, nine separate class-action lawsuits were filed against BCBSM, BCBSA, and other local Blue Plans throughout the United States for antitrust violations.  These cases were consolidated into a multi-district class action suit in the Northern District of Alabama in January of 2013. *See In re: Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, United States District Court for the Northern District of Alabama Southern Division, Case No. 2:13-cv-20000-RDP.

72.     The *In re: Blue Cross Blue Shield Antitrust Litigation* involved allegations that BCBSM, BCBSA, and other Blue Plans throughout the country violated state and federal antitrust laws by entering into an agreement where BCBSM, BCBSA, and the other Blue Plans agreed not to compete with each other in selling health insurance and ASO services in each other's territories, as well as agreeing to other means of limiting competition in the market for health insurance and administration.

73.     BCBSM, and its other co-defendants, recently settled the *In re: Blue Cross Blue Shield Antitrust Litigation* for approximately $2.7 billion in 2020, and this settlement was approved by the multi-district court in October of 2022.

74.     However, BCBSM itself is still facing individual lawsuits for the same unlawful conduct alleged therein, from some individual plaintiffs, like Ford Motor Company, who timely opted out of the class settlement and chose to independently

pursue their claims. *See Ford Motor Company v. Blue Cross Blue Shield of Michigan Mutual Insurance Company and The Blue Cross Blue Shield Association*, United States District Court for the Eastern District of Michigan, Case No. 2:23-cv-11286.

75.     As a result of the unlawfulness and anticompetitive effects of BCBSM's conduct over the last two decades, particularly the effects associated with its MFNs, on March 18, 2013, the Michigan legislature took affirmative action against BCBSM, passing legislation that, among other reforms, prohibited BCBSM and other insurers from including or using MFNs in any of its contracts. *See* MCL 500.3405a.

76.     Although this ban on the use of MFN clauses in provider contracts removed one of BCBSM's anticompetitive contracting practices from its toolbelt, BCBSM saw this legislative action as an opportunity.

77.     Not only did the legislative ban on BCBSM's MFN resolve the pending DOJ and State of Michigan antitrust lawsuit against BCBSM without further expense or judgment being found against BCBSM,[5] but Michigan's lawmakers

---

[5] U.S. Department of Justice, *Justice Department Files Motion to Dismiss Antitrust Lawsuit Against Blue Cross Blue Shield of Michigan After Michigan Passes Law to Prohibit Health Insurers from Using Most Favored Nation Clauses in Provider Contracts* (Mar. 25, 2013) https://www.justice.gov/opa/pr/justice-department-files-motion-dismiss-antitrust-lawsuit-against-blue-cross-blue-shield (explaining the DOJ and State of Michigan filed a motion to dismiss on March 25, 2013 because the

decision to engage in the legislative process to address BCBSM's misconduct meant that BCBSM could use its excess reserves to lobby for and obtain additional concessions from the Michigan Legislature, including one that it had been seeking for over 30 years.

78.    Since the 1970s and 1980s, BCBSM, like many other BCBSA licensees, has lobbied state legislatures to have special treatment under the state insurance laws.

79.    In Michigan, the enabling statute that governed BCBSM for many years, and up until January 1, 2014, was 1980 P.A. 350 (the Nonprofit Health Care Corporation Reform Act, MCL 550.1101 *et seq*.).

80.    Even though the Michigan legislature worked on 1980 P.A. 350 for two years before its enactment and "BCBSM participated every step of the way,"[6] BCBSM heavily opposed this law once it was enacted.

81.    After the law was passed, BCBSM even sued the State of Michigan arguing that the 1980 P.A. 350 legislation was "unconstitutional," resulting in a

---

law enacted by the Michigan Legislature on March 18, 2023 rendered further proceedings "unnecessary.").

[6] Daniel P. Weber, *Mutualization of Blue Cross and Blue Shield of Michigan: Healthy for Michigan?*, PUBLIC POLICY ADVISOR (Nov. 2, 1987) https://publicsectorconsultants.com/wp-content/uploads/2017/01/110287_ppa.pdf.

lengthy opinion from the Michigan Supreme Court in 1985 that largely sustained the constitutionality of the law.[7]

82. According to the Michigan Attorney General, BCBSM wanted to "avoid [1980 P.A. 350] altogether by becoming a mutual insurance company."[8]

83. BCBSM's argument for wanting to become a "mutual insurance company" was that 1980 P.A. 350 "put the corporation at a competitive [dis]advantage with other insurers because strict regulation" under the law impeded BCBSM's ability to develop alternative insurance plans, and "package" and bundle other insurance business, like other insurers at the time.[9]

84. Michigan's Attorney General, at the time, argued such claims and BCBSM's stated intent to be treated as a mutual disability insurer were without merit as by 1980 BCBSM had already captured "a large share" of the non-traditional health insurance sub-markets in Michigan by developing new HMO and PPO plans for employers and "entering into a large number of ASO contracts."[10]

85. Indeed, many stakeholders at the time believed that if the legislature allowed BCBSM to mutualize (even back in 1980), it would have resulted in

---

[7] *Blue Cross & Blue Shield of Michigan v. Milliken*, 422 Mich. 1, 11; 367 N.W.2d 1 (1985) (largely upholding the constitutionality of 1980 P.A. 350 and only agreeing with BCBSM on the unconstitutionality of 3 of the 46 sections challenged).

[8] Weber, *supra* Note 6, p 4.

[9] Weber, *supra* Note 6, p 5.

[10] Weber, *supra* Note 6, p 14.

BCBSM "monopoliz[ing] the health care insurance market in Michigan[,]" including the ASO/ASC and TPA contract market.[11]

86.     As one consultant explained, if BCBSM mutualizes it would put the "Blues' competitors at an even greater disadvantage than they are at present given the Blues' ability"[12] to use their broad and well-established volume discount provider network in conjunction with any other products and services it would be permitted to develop as a mutual insurer.

87.     BCBSM never gave up.  And in January 2014, after spending millions of dollars in lobbying efforts and increasing its lobbying spending by at least 1.5x on the heels of the DOJ's and State of Michigan's antitrust lawsuit in 2010, BCBSM successfully lobbied the legislature to enact Public Act 4 of 2013 (SB 61) allowing BCBSM to become a mutual disability insurer:

**BCBSM's Lobbying Spend (2010 – 2015):[13]**

| 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|------|------|------|------|------|------|
| $259,377.75 | $288,986.49 | $402,414.12 | $337,340.37 | $326,165.64 | $301,789.51 |

---

[11] *Id.*

[12] *Id.* at 17.

[13] Michigan Department of State, *Financial Information for Blue Cross and Blue Shield of Michigan* https://miboecfr.nictusa.com/cgi-bin/cfr/lobby_detail.cgi?last_match%3D%26exp_last_match%3D50%26lobby_type%3D%2A%26lobby_name%3DBLUE+CROSS%26doc_type_code%3D%2A%26detail_options%3Dind%26expense_options%3Dtotal%26amnt_greater%3D1%26sort_1%3Damount%26sort_2%3Dlobby_name%26lobby_id%3D646%26exp_last_match%3D0 (last visited Oct. 21, 2024).

88.    Thus, as evidenced by BCBSM's conduct over the last few decades, BCBSM repeatedly takes extensive measures to protect not only its insurance reserves and surplus by restraining competition through anticompetitive schemes, but also will use any efforts (including a significant amount of lobbying spend) to grow, develop, and maintain its established market power in the various health care insurance markets, and sub-markets, in which it sells its products and services in.

89.    As alleged in further detail below, the adoption and implementation of BCBSM's Penalty Fee at issue in this case is just another one of BCBSM's ruses to restrain competition and protect its dominant position in the relevant markets.

## B.    OVERVIEW OF COMMERCIAL HEALTH INSURANCE IN MICHIGAN.

90.    The allegations contained within this Complaint do not involve health care products or services obtained through government programs, such as Medicare and Medicaid.  Nor do they involve health insurance that is sold directly to individual consumers through a public exchange.

91.    Instead, the allegations in this Complaint concern the sale of specific products and services (i.e., ASO/ASC/TPA services and stop-loss insurance) by BCBSM to certain customers (i.e., Self-Funded Accounts) in the commercial health insurance industry.

### 1.    Customers in the commercial market.

92.    In Michigan, as throughout the United States, most people obtain health care coverage for themselves and their dependents from their employer.

93.    Thus, Self-Funded Accounts established by employers like Wesco or through joint association multi-employer plans like the UWUA Fund, and other Class Members, are the "customers" who select which group insurance plan or plans they will offer to their employees or members.

94.    Then, eligible employees or members (and their dependents) choose whether to enroll in the specific group health insurance plans offered by their employer.   Eligible individuals and their dependents are often referred to as "members," "insureds," or "covered lives."

### 2.    Types of plans.

95.    Health insurance companies, like BCBSM, offer employers different types of group health benefit plans which contain a combination of administrative services and access to a network of medical care providers.

96.    Generally, there are two types of group health benefit plans: (a) **fully insured plans** and (b) **self-funded (or self-insured) plans**.

97.    Under either plan, the health insurance company typically processes and adjudicates the medical claims of the plan's members.

98.    However, fully insured plans and self-funded plans differ in who bears

the financial responsibility for medical costs and claims, and the risk associated with such claims.

99. Under a **fully insured** plan, the employer pays the commercial insurance company a premium, and in return the commercial health insurance company underwrites the risk and assumes the financial responsibility associated with the health care costs incurred by the employees and their dependents, in addition to administering the claims.

100. In contrast, under a **self-funded** plan, the employer, joint association, and/or plan sponsor assumes the risk for paying the health care claim costs for their employees, members, or enrollees.

101. Thus, employers or accounts that are self-funded do not actually insure their employees or enrollees at all in the sense that they do not actually purchase health insurance from an insurance company. Instead, self-funded employers or accounts pay for each out-of-pocket claim as they are incurred instead of paying a fixed premium to an insurance carrier.

102. For both economic and contractual restraints within the health care industry, self-funded employers or accounts frequently contract with commercial health insurance carriers, like BCBSM, to serve as a third-party administrator (TPA) of the self-funded plan to handle claims processing and other administrative tasks under an ASO or ASC contract.

103.   These TPAs are typically the same insurance companies that provide fully insured commercial health insurance plans in the region where the self-funded employer and its employees are located, which can lead to confusing both members and providers as to who the insurer actually is.

104.   In exchange for providing administrative services, the employer or account holder will sign an ASO or ASC agreement and pay the insurer additional administrative fees, which also provides the self-funded account's enrollees access to the health insurance company's provider network, claims administration, and adjudication services.

105.   Because employers or accounts who self-fund underwrite the risk, they are generally expected to have the financial capacity to pay for the future health care claim costs incurred by their employees or enrollees.

106.    However, health care claims and costs are unpredictable and can be financially catastrophic, so almost every employer or account with a self-funded health benefit plan purchases reinsurance to protect itself from extraordinarily high medical costs.

107.   This type of reinsurance is called "**stop-loss insurance.**"

108.   As a practical matter, stop-loss insurance works by the health insurance company underwriting an insurance policy to reimburse the employer or account for

claims above a specified dollar amount that is agreed to in advance, in exchange for a premium.

109.   Thus, stop-loss insurance shares the risk between the employer or account and the stop-loss carrier, protecting the employer or account against large claims and shielding them from potentially devastating financial burdens.

110.   The same commercial health insurance carriers who provide TPA services, like BCBSM, also provide stop-loss insurance to employers or accounts who are self-funded.  Again, creating the chance for confusion among individual members and providers as to who the insurer is, since the risk is actually shared under these plans.

111.   Thus, commercial health insurance carriers, like BCBSM, have become notorious within the health insurance industry.

112.   Ultimately, employers (or other associational entities or accounts) who establish self-funded plans decide what plan to purchase based on what's best to manage their health care costs.

### 3.      Provider networks.

113.   Regardless of whether a group health insurance plan is fully insured or self-funded, they also differ in how the plan provides enrollees or members with access to a health care provider network.

114.   Under a traditional plan (also known as an indemnity plan), a health insurance carrier reimburses the insured for covered health care expenses performed by *any* provider, at *any* hospital or physician office.   These historically were known as fee-for-service plans, since health care providers and hospitals would bill as each service is performed, no matter where the insured went to receive services.

115.   In contrast to full indemnity plans, most health insurance plans today operate as "managed care organizations" ("MCO").

116.   Under a MCO plan, commercial health insurance companies, like BCBSM, engage in contract negotiations with health care providers (hospitals, doctors, and other providers) through which the providers agree to accept payment for services supplied to the health insurance company's plans at a discounted rate in return for the anticipated volume of patients that the health insurance company will essentially deliver to them by deeming such providers as "in-network" providers.

117.   Employees or members who receive care from out-of-network providers will often face higher fee schedules with no discounts.

118.   As part of these negotiations, health care providers have historically been forced to agree to certain contractual restraints imposed by the insurance companies such as: (i) the provider must discount their rates and is prohibited from "balance billing" (i.e., charging a patient more than the "allowable amount" agreed to between the insured and provider); (ii) the provider must agree to guarantee that

an insurer would have the most favorable discount; or (iii) anti-steering provisions or gag clauses that impede price transparency and competition.[14]

119.   Additionally, customers, like Plaintiffs and the Class Members, are not part of such provider negotiations.

120.   Therefore, individual consumers and employers have historically been left in the dark regarding what pricing or what discounts (if any) are being agreed to, and what percentage of payments for medical care costs are being retained by the insurance companies.

121.   To make these provider networks viable and attractive to employers sponsoring health plans for their employees, commercial health insurance companies strive to assemble networks that are comprehensive in scope and superior in quality and price, among other factors.

122.   There are several types of MCOs, but the most common include:

    a. **Exclusive Provider Organization (EPO):** A MCO plan where medical services are covered only if you use providers in the plan's network (except in an emergency).

---

[14] The anticompetitive effects associated with these sort of contract terms is the basis of numerous individuals and class action lawsuits across the country against BCBSM and other licensees of BCBSA.  *See e.g., Ford Motor Company v. Blue Cross Blue Shield of Michigan Mutual Insurance Company and The Blue Cross Blue Shield Association* (case No. 2:23-cv-11286-LVP-EAS) [ECF No. 1] May 31, 2023; *The Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, United States District Court for the Eastern District of Michigan, Case No. 2:10-cv-14360; and *In re: Blue Cross Blue Shield Antitrust Litigation*, MDL 2406, United States District Court for the Northern District of Alabama Southern Division, Case No. 2:13-cv-20000-RDP.

b. **Health Maintenance Organization (HMO):** A MCO plan that usually limits coverage to care from providers who work for or contract with the HMO. This means costs for medical services outside of the HMO network are not covered, except in an emergency. Further, HMOs sometimes require individuals live or work in the service area to be eligible for coverage.

c. **Preferred Provider Organization (PPO):** A MCO where individuals pay less if they use providers in the plan's network. Typically, individuals may not use providers outside of the network without a referral for an additional cost.

123. Regardless of which type of MCO a health plan may be (HMO, PPO, or EPO), the backbone of any managed health care plan is access to the provider network (including the negotiated pricing, discounts, and quality of care negotiated by the insurance companies and network providers).

124. Because of these unique features of the health care industry, particularly the control insurance companies, like BCBSM, have in assembling discounted provider networks and the inability of consumers to obtain any *ex ante* pricing for health care services and products before purchasing and consuming, competition among health insurance companies is essential for controlling health care costs and ensuring services are of acceptable quality at competitive prices.

125. However, as alleged above and set forth in more detail below, by BCBSM imposing its Penalty Fee on all of its self-funded customers which have chosen to purchase stop-loss insurance from BCBSM rivals, it has short-circuited normal competition within the Michigan stop-loss insurance market from occurring

and enabled BCBSM to exploit its market power in the TPA Market in order not only to maintain and grow its market power in the Stop-loss Market, but also to ultimately charge supracompetitive prices.

### C.   PLAINTIFFS ENGAGED BCBSM TO SERVE AS THEIR TPA AND STOP-LOSS INSURER.

#### 1.   WESCO.

126.   In 2003, BCBSM began providing third-party administrative services to Wesco's self-funded health benefit plan.

127.   Specifically, BCBSM and Wesco entered into an administrative services contract (ASC) effective on December 1, 2003.

128.   On or around December 2012, an updated ASC agreement was executed between Wesco and BCBSM, with substantially similar terms.

129.   Pursuant to Wesco's ASC agreement, BCBSM agreed to administer Wesco's self-funded health benefit plan by paying covered employee/enrollee health care claims on behalf of Wesco and its health benefit plan, using money provided to BCBSM by Wesco.

130.   The obligations of the parties were outlined in the ASC:  BCBSM would process and pay, and Wesco would reimburse BCBSM for all "Amounts Billed" related to any of Wesco's Enrollees' Claims (*i.e.*, requests for payment of a health care service) in accordance with BCBSM's standard operating procedures.

131. "Enrollees" are defined in the ASC as Wesco employees and dependents of Wesco employees who are eligible and enrolled for coverage in Wesco's health benefit plan.

132. In exchange for its services, BCBSM was entitled to various administrative fees.

133. The Wesco ASC does not contain any pricing or commercial terms themselves. Rather, the specific fee amounts to be paid by Wesco in exchange for the TPA services provided by BCBSM were enumerated in a Schedule A.

134. The ASC agreement between Wesco and BCBSM was separately renewed, newly executed, and re-negotiated year after year by the parties via new Schedule As until the end of 2022 when Wesco transitioned to another TPA service provider.

135. Wesco also purchased stop-loss coverage from BCBSM.

136. Specifically, BCBSM agreed to provide the Stop Loss coverage(s) selected by Wesco as stated in each newly executed Schedule A to the ASC agreement.

137. Wesco purchased Specific Stop Loss coverage only, meaning BCBSM would reimburse Wesco for any Amounts Billed during a Contract Year which exceed the Specific Attachment Point per Unit.

138.   A "Unit" is defined as an "employee" plus their "eligible/enrolled dependents."

139.   Specific Attachment Point "means that number which separates BCBSM's liability and the Group's liability for Amounts Billed for all members of a Unit for a Contract Year."

140.   In 2022, Wesco's Specific Attachment Point was $145,000, meaning that if any Unit (i.e., an employee and/or their eligible dependents) had medical costs that exceeded $145,000 in 2022, Wesco's liability for such claims would stop at the $145,000 attachment point and BCBSM would be liable for the excess.

141.   In exchange for BCBSM providing stop loss insurance—which essentially serves as reinsurance for any unexpected or catastrophic claims Wesco could face as the sponsor—Wesco would pay BCBSM a monthly premium for stop loss coverage separate and independent from any administrative services fees, reimbursement for amounts billed, or Provider Network Fees.

142.   Wesco's Schedule A for the Renewal Term December 2011 – November 2012 ASC is the first Schedule A where the following provision setting forth **BCBSM's Penalty Fee** appeared:

> "BCBSM will charge an additional administrative fee of $4.00 per contract per month if an ASC customer obtains stop-loss coverage from a third-party stop-loss vendor."

143.   In Wesco's Schedule A for the Renewal Term December 2018 – November 2019, the Penalty Fee was increased to $6 PCPM if Wesco obtained stop-loss coverage from a third-party stop-loss vendor.

144.   A year later, in Wesco's Schedule A for the Renewal Term December 2019 – November 2020, the Penalty Fee was increased to $8 PCPM if Wesco obtained stop-loss coverage from a third-party stop-loss vendor.  *Id*.

145.   For Wesco, BCBSM's Penalty Fee remained at $8 PCPM for each new Schedule A Wesco executed with BCBSM thereafter until Wesco left BCBSM altogether and engaged a new TPA service provider and stop-loss insurer starting in 2023.  *Id*.

146.   Together, the ASC, any stop loss addendums, and each Schedule A re-negotiated each year form the contractual relationship between Wesco and BCBSM.

147.   Each of these contract documents were boilerplate documents drafted by BCBSM.

148.   Upon information and belief, each Class Member, as defined below, entered into identical or substantially similar agreements with BCBSM, including the Penalty Fee provision.

## 2.   **The UWUA Fund**.

149.   Prior to 2016, the UWUA Fund purchased and BCBSM administered a fully insured health benefit plan.

33

150.   Effective January 1, 2016, the UWUA Fund transitioned to a self-funded health benefit plan.

151.   As a result, the UWUA Fund and BCBSM entered into an ASC effective, January 1, 2016.

152.   Akin to Wesco's ASC agreement with BCBSM, the UWUA Fund's ASC was separately renewed, newly executed, and re-negotiated year after year by the parties executing a new Schedule A.

153.   The UWUA Fund, like Wesco, also purchased stop-loss insurance from BCBSM, effective January 1, 2016.

154.   The UWUA Fund, like Wesco, also selected "Specific Stop Loss" coverage, meaning BCBSM would reimburse the UWUA Fund for any eligible claim amounts (e.g., medical or prescription drug claims) billed that exceed the specific attachment point set forth in the stop-loss policy, which was renewed and renegotiated each year.

155.   Each Schedule A between the UWUA Fund and BCBSM contained BCBSM's Penalty Fee provision, but the amounts differed over the years.[15]

---

[15] Due to BCBSM's recent efforts to re-label its Penalty Fee provision within the UWUA Fund's most recent Schedule A so that it now purportedly falls within certain restrictive/nondisclosure covenants, the specific amount and/or range of the Penalty Fee provision within the UWUA Fund's Schedule As are not explicitly revealed in this Complaint. In this manner, BCBSM's efforts to re-label its Penalty Fee provision operate in a manner that is no different than a gag clause that are generally prohibited in similar group health plan contracts. *See e.g.,* CAA 2021.

156.    BCBSM's use of its discretion and willingness to change its Penalty Fee on a year-by-year basis demonstrates it is untethered to any legitimate administrative cost associated with providing claim information—rather, it is aimed at furthering BCBSM's objective of precluding and reducing competition among its rivals.

157.    Effective January 1, 2024, the UWUA Fund engaged a third-party stop-loss insurance provider and has been forced to pay BCBSM's Penalty Fee ever since.

### D.    RELEVANT MARKETS.

158.    The relevant markets pertinent to the illegal conduct described in this Complaint are properly defined herein.

### 1.    Relevant Product Markets.

159.    There are two product markets that are relevant to this Complaint: (a) Self-Funded Accounts that purchase and enter into ASOs or ASCs or other like agreements with third-party administrators (TPAs) (the "**TPA Market**") and (b) Self-Funded Accounts that purchase stop-loss insurance (the "**Stop-loss Market**").

160.    The TPA Market includes Self-Funded Accounts that purchase ASO or ASC agreements from commercial health insurers, like BCBSM, or independent TPA providers to serve as their health plan administrators and provide various services, including access to a health care provider network at discounted rates, claim administration and adjudication support, and other services.

161.   The sale of ASOs, ASCs or like agreements by commercial health insurance companies or independent TPA providers to Self-Funded Accounts is recognized as a transaction in an economic market quite distinct and separate from the economic market for stop-loss insurance, as many commercial health insurers have separate business units and/or agreements dedicated to this line of business.

162.   There are no reasonable alternatives for employers (or other associational entities or accounts) who wish to self-fund their group health benefit plans and purchase TPA services via ASO or ASC agreements to manage and lower their insurance costs, as fully-insured plans would require such employers or accounts, like Plaintiffs and the Class Members, to obtain cost prohibitive insurance at a substantial premium expense.

163.   Stop-loss insurance also exists as its own sub-market in the commercial health insurance industry.  It is a unique economic product and not a substitute for any other form of health insurance.

164.   The Stop-loss Market includes Self-Funded Accounts that purchase stop-loss insurance as a form of reinsurance.  As of 2022, the health care stop-loss insurance market is believed to be a roughly $19.4 billion industry in the U.S. and is a separate market from the TPA Market.

165.   The TPA Market and Stop-loss Market are separate and distinct because the two types of products and services are not interchangeable and can be sold separately.

166.   In fact, Self-Funded Accounts can, and *do in competitive markets*, purchase stop-loss insurance from different vendors than the health insurance carriers they engage to provide TPA services.  TPA services and stop-loss insurance are neither substitutes, as required for products in the same economic market, nor are they perfect complements that make them an inviolable bundle, each useless without the other.

167.   Precisely making this point, there are more sellers of one or the other product but not both. The National Association of Insurance Commissioners (NAIC) Accident and Health Policy Experience Reports for 2023 lists 38 Michigan TPA companies logging TPA member months in 2023. Only five of them sell stop-loss policies. Therefore, TPA services and stop-loss insurance are distinct economic products sold in distinct economic markets.

168.   The distinction between the TPA Market and Stop-loss Market is also widely recognized in the academic, government reporting, and government regulatory literature on the health care industry.

169.   Both relevant product markets, the TPA Market and Stop-Loss Market, satisfy the conditions for market definition used by federal antitrust enforcement

agencies (e.g., each of these markets constitute a distinct group of products or services in which a hypothetical monopolist could profitably impose at least a small but significant non-transitory increase in price above competitive levels (i.e., at least 5%)).

170. BCBSM provides both TPA and stop-loss insurance products and services in the relevant Geographic Market defined below. But as alleged in further detail below, due to BCBSM's anticompetitive conduct, the Self-Funded Accounts who purchase TPA services from BCBSM via ASO or ASC agreements are induced with inescapable Penalty Fees into also purchasing stop-loss insurance from BCBSM.

### 2. Relevant Geographic Market.

171. The relevant geographic market is the entire state of Michigan (the "**Geographic Market**").

172. Collectively, the TPA Market, Stop-loss Market and the Geographic Market may be referred to herein as the "**Relevant Markets**."

173. The relevant consumers in this case, namely Self-Funded Accounts who purchase either TPA services, stop-loss insurance, or both, typically require access, services, and insurance coverage for most or all local areas throughout the state of Michigan.

174.   This is because individual members or enrollees who need coverage in one local area (e.g., Detroit) cannot practicably travel to another local area (e.g., Grand Rapids) if their health plan does not provide coverage in their local area.

175.   Additionally, individual members or enrollees typically desire access to affordable health care wherever they travel within the state and prefer to have the option of continuing their existing insurance coverage if they move to another county or area in the state.

176.   Thus, TPA and stop-loss insurance providers, like BCBSM, compete for the business of Self-Funded Accounts throughout the state of Michigan and within the various local geographic sub-markets.

177.   Further, TPA firms providing services anywhere in the state of Michigan must register with and be certified by Michigan's Department of Insurance and Financial Services under state-wide regulations unique to Michigan.

178.   Similarly, companies selling stop-loss insurance to any entity in Michigan must be registered and licensed by Michigan's Department of Insurance and Financial Services and must file rates for each stop-loss insurance plan it intends to offer to consumers in Michigan.

179.   The relevant consumers in this case, namely Self-Funded Accounts, are firms located in Michigan that purchase or might purchase stop-loss policies for their employees and their families. These firms are unlikely to relocate outside of

Michigan solely because of a five percent increase in the prices of either TPA services or stop-loss insurance.

180.  In other words, no consumer of TPA services or stop-loss insurance is likely to relocate outside of Michigan to take advantage of lower rates elsewhere and no out-of-state provider of TPA services or stop-loss insurance can sell TPA services or stop-loss insurance without "entering" Michigan as a registered, certified TPA provider or licensed/rate-filing seller of stop-loss insurance in Michigan.

181.  Plaintiffs and Class Members have purchased TPA administrative services and stop-loss insurance coverage throughout the state of Michigan and all relevant geographic sub-markets within the state of Michigan.

182.  BCBSM's unlawful conduct has negatively impacted competition and harmed Plaintiffs and the Class Members throughout the state of Michigan.

183.  There are no reasonable substitutes or alternative geographic markets.

184.  In fact, given BCBSM's regulatory mandate and non-compete agreements with other BCBSA affiliated plans, BCBSM would not be able to expand its membership base to other states.

185.  Further, Self-Funded Accounts in Michigan, like Plaintiffs and the Class Members, nearly always demand that the TPA services and stop-loss insurance products they purchase cover services and claims throughout the state of Michigan— not just one local geographic region.  In fact, the subscribers and/or enrollees of the

Plaintiffs self-funded group health benefit plans are not just limited to one specific locality.

186.   Accordingly, for the purposes of this Complaint, it follows that the state of Michigan is the relevant geographic market for both TPA services provided via an ASO or ASC agreement and stop-loss products.

187.   In addition, Michigan as the relevant geographic market is particularly useful for analyzing BCBSM's conduct and the effects of its conduct in this case. BCBSM sells its TPA services and stop-loss policies throughout Michigan and only in Michigan.

188.   And competition from providers outside of the State of Michigan for self-funded group health benefits and stop-loss insurance would likely not be sufficient to prevent a hypothetical monopolist from profitably imposing at least a small but significant price increase above competitive levels for such products and services over a sustained period of time.

### E.   BCBSM'S MARKET POWER.

189.   The essence of an unlawful tying and/or bundling arrangement is when a defendant wields its monopolistic leverage by exploiting its dominant position in one market to expand, grow, or maintain its empire into the next.

190.   BCBSM has market power within the Relevant Markets, rising to monopoly power in the TPA Market.

41

191. Due to BCBSM's unlawful conduct, BCBSM has maintained, acquired, and bolstered its market power in the Relevant Markets, including monopoly power in the TPA market.

192. *Market power* generally refers to a seller's ability to raise prices above a competitive level or otherwise coerce a buyer to do something that he would not normally do in a competitive market.

193. Market power may be established by using direct evidence, such as: (a) the defendant coercing buyers to accept unwanted contractual terms; or (b) charging supracompetitive prices that reduce quality or output.

194. Alternatively, market power may be shown through indirect evidence demonstrating that BCBSM has substantial market shares in the relevant product or geographic markets.

195. Here, BCBSM's market power can initially be shown through its market share in the TPA and Stop-loss Markets throughout the state of Michigan.

196. BCBSM is undoubtedly the largest provider of health insurance in Michigan.

197. In BCBSM's own words, it is unmatched in size and scale, and has the broadest medical access of any carrier in the country.

198. For over 75 years, it has been Michigan's leading health care company and has the largest provider network in the state of Michigan.

42

199.   For insurance companies, there are generally two methods of measuring market share:  the percentage of population covered, and the percentage of premium dollars paid.

200.   With respect to its market share for the TPA Market (i.e., the tying and/or bundling product market), BCBSM provides third-party administrative services and coverage to approximately 71.5% of all TPA arrangements in the state of Michigan, including Plaintiffs and the other Class Members.

201.   With respect to the Stop-loss Market (i.e., the tied and/or bundled product market), BCBSM is the largest stop-loss insurance provider in the state of Michigan, receiving over $354 million of premiums in 2023.

202.   BCBSM's market share in the 2023 Stop-loss Market in Michigan is 43.4%, a level all the more significant by the fact that its nearest rival, Corewell Health GRP (Priority Health), has only a 9.3% share.  Only two others, CVS GRP and Sun Life Financial Inc. GRP, have shares above 5% at 7.6% and 6.2%, respectively.  Thirty-six others have *de minimis* shares.

203.   Market shares of this magnitude create an inference of market power, as BCBSM is seen to have a dominant position throughout the Relevant Markets.

204.  Market power can also be demonstrated with evidence of supracompetitive pricing.   An industry standard for measuring a company's

profitability in the stop-loss industry is its loss ratio.[16]  A lower loss ratio indicates a more profitable insurance company.

205.   In 2022, BCBSM's loss ratio was 64.4%. The national average loss ratio for stop-loss insurance was 84.1%, and the two largest stop-loss insurers (CIGNA and United Health) had a loss ratio as high as 85.2% and 95.9%, respectively.

206.   This meant that BCBSM ranked 19th in stop-loss premiums among all stop-loss insurers *nationwide*.  Additionally, between 2019-2022 BCBSM averaged a 63.1% loss ratio, which was lower than any other top 25 stop-loss carrier in the country which collectively accounted for more than 85% of total stop-loss premiums nationwide.  Indeed, over the same time period, the average loss ratio for the other top 24 companies was 80.5%.

207.   Thus, BCBSM's stop-loss insurance business is considered far more profitable than any other leading stop-loss insurer in the country.

208.   Even if BCBSM did not have such dominant positions within the Relevant Markets, BCBSM undoubtedly has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within each of the Relevant Markets.

---

[16] Loss ratio = (insurance claims paid + loss adjustment expenses) / (total earned premiums).

209.    Indeed, notwithstanding such large market shares and extraordinarily low loss ratios indicating BCBSM's well-established market power in the Relevant Markets, there is also substantial direct evidence of BCBSM's market power and its intent to maintain its market dominance.

210.    For example, BCBSM has consistently demonstrated an ability to exercise market power by adopting policies and schemes (such as its Penalty Fee at issue in this case) to raise prices substantially above competitive levels, reduce output and decrease the quality of service.

211.    According to annual insurance reports, since the inception of BCBSM's Penalty Fee, BCBSM's market share in the TPA Market in Michigan has only increased, further demonstrating the magnitude of BCBSM's market power. BCBSM's Penalty Fee is also having a direct anticompetitive effect on the Relevant Markets in Michigan; particularly, when other schemes by BCBSM, such as its MFNs, have been outlawed.

212.    Additionally, as set forth *infra*, BCBSM has imposed supracompetitive prices and obtained more profitable loss ratios in the Stop-loss Market at rates substantially above the statewide and national average for stop-loss insurance.

45

213.   As a result of BCBSM wielding its market power in the Relevant Markets, particularly the ASO/TPA Market, the annual report from the American Medical Association has "again ranked Michigan as the second-least competitive state" in the country.[17]

### F.   BCBSM'S UNLAWFUL CONDUCT.

214.   Since on or before January 2011, BCBSM has engaged in a deliberate, willful, and unlawful scheme to gain, maintain, and increase both its monopoly power in Michigan's TPA Market and its market power in Michigan's Stop-loss Market, substantially foreclosing competition and thereby imposing supracompetitive prices on Plaintiffs and members of the proposed Class.

215.   BCBSM's use of its Penalty Fee to generate these anticompetitive effects and leverage, maintain, and grow its monopoly power in the TPA Market and to coerce self-funded customers to also pay inflated prices for stop-loss insurance and reduce competition among stop-loss carriers violates both federal and state antitrust laws.

---

[17] Mark Sanchez, *Michigan health insurance market ranks as 2nd least competitive in nation*, Crain's Grand Rapids Business (Dec. 21, 2023) https://www.crainsgrandrapids.com/news/health-care/michigan-health-insurance-market-ranks-as-2nd-least-competitive-in-nation/#:~:text=Grand%20Rapids%2Dbased%20Priority%20Health,share%2C%20according%20to%20the%20AMA.

216.   Specifically, on or before January 2011, BCBSM decided to implement its Penalty Fee as a standard contractual provision for all Self-Funded Accounts who entered into ASO or ASC agreements with BCBSM for TPA services.

217.   BCBSM has used such fees:  to restrain, deter, preclude, and/or reduce competition in violation of state and federal antitrust laws.

218.   In particular, in or around 2011, BCBSM instituted its $4 Penalty Fee on a PCPM basis as a standard provision in its ASO or ASC agreements to be assessed if and when a Self-Funded Account customer went elsewhere to purchase stop-loss insurance.

219.   A PCPM basis means that each TPA customer who entered into a ASO or ASC agreement with BCBSM, including Plaintiffs and the Class Members, would pay a fee for each contract the Self-Funded Account has with an individual enrollee/employee (and their eligible dependents) per month *if* they were to purchase stop-loss insurance from a third-party vendor.

220.   Over the years, BCBSM has increased its Penalty Fee to the point that, as of today, most of BCBSM's self-funded customers who have purchased BCBSM's TPA services via a ASO or ASC agreement have a Penalty Fee provision of at least $8 PCPM in their contracts.

221.   Thus, if a Self-Funded Account's health plan covers 500 individual members or enrollees, there would be a $8 fee charged for all 500 contracts ($4,000)

every month ($4,000 x 12 months = $48,000 *a year* in fees) *if* that Self-Funded Account chose to procure stop-loss coverage elsewhere.

222.   For those customers who may pay less than $8 PCPM, their Penalty Fee is at least $4 PCPM and is still significant.

223.   BCBSM has no legitimate cost justification for imposing such a financially coercive and unlawful Penalty Fee, particularly on a PCPM basis, as it bears no rational relationship to the actual costs and expenses incurred by BCBSM.

224.   *First*, whether BCBSM stores data on a 1,000-person account or a 200-person account, it is required to incur the same (albeit minimal) costs and expenses associated with storing the relevant health data regardless if the account was using BCBSM or a third-party stop-loss insurer.

225.   *Second*, evident by how BCBSM has selectively imposed differing Penalty Fee amounts for certain customers, its fee is completely discretionary and untethered to the actual *de minimis* cost associated with providing claims information to a third party.

226.   Indeed, if BCBSM's Penalty Fee was actually tied to the true costs incurred by BCBSM, it could not have feasibly entered into agreements at $8 PCPM for one year and then change to a $4 PCPM fee the next year; particularly without materially raising and/or recouping the costs elsewhere.   But, upon information and belief, that did not happen, as the base administrative fees and other costs within

BCBSM's Schedule As entered into with any self-funded customers whom BCBSM exercised such discretion with were essentially the same.

227. *Third*, it is unlikely that BCBSM is incurring significantly more labor or administrative costs and expenses in running a report to share with a third-party stop-loss insurer for a 1,000-person Self-Funded Account versus a 200-person Self-Funded Account to justify charging a PCPM fee. With modern technology and computer software programs, the time and labor associated with running a report or data feed to be shared with a third-party is minimal (at best) regardless if the account has 1,000-entries or 200-entries.

228. *Lastly*, when BCBSM imposed its fee for the first time, and when BCBSM also increased its Penalty Fee to $8, it did so knowing it was charging a fee that was more than triple the amount that any other insurer was charging in the marketplace.

229. Because it is highly unlikely that BCBSM was incurring administrative costs at exceedingly higher rates than its rivals, the intent of BCBSM's imposition of its Penalty Fee was to preclude competition, serve as a deterrent for customers going elsewhere for stop-loss insurance, and otherwise coerce TPA customers to purchase stop-loss insurance from BCBSM.

230. BCBSM has used its market power to abuse its contracting practices for its own anticompetitive purposes.

49

231. In fact, according to "several industry insiders" BCBSM's Penalty Fee has become "so exorbitant…that it's anti-competitive, unjustified, and bad for the consumer."[18]

## G.    ANTICOMPETITIVE EFFECTS OF BCBSM'S CONDUCT.

232. By unlawfully tying and/or bundling the purchase of stop-loss insurance from BCBSM with the purchase of BCBSM's TPA administrative services through imposing a Penalty Fee on all Self-Funded Account customers that opt to purchase stop-loss insurance from an insurer other than BCBSM, BCBSM has anticompetitively and artificially impaired the ability of actual or potential stop-loss insurance providers from competing with BCBSM in Michigan.

233. As a result, BCBSM's impermissible actions have harmed competition, including, but not limited to:

- Substantially foreclosing open and free competition in Michigan's stop-loss insurance market by keeping BCBSM's actual competitors' market shares at levels that are too low to constrain BCBSM from charging prices to self-funded customers at prices above that which would be tolerated in a competitive market;

- Weakening existing rivals' ability to compete with lower prices by forcing rivals to discount their prices of stop-loss insurance to compensate customers for the Penalty Fee (i.e., a nontrivial departure tax) that they need to pay BCBSM;

---

[18] Bruce Shutan, *Steep Interface Fee Hikes*, THE SELF-INSURER (Sept. 2015), https://www.sipconline.net/files/Steep%20Interface%20Fee%20Hikes%20Draw%20Industry%20IRE%20by%20Bruce%20Shutan.pdf.

- Raising the costs of its rivals, as BCBSM's rivals assume the cost of BCBSM's Penalty Fee when servicing any stop-loss customers who migrate from BCBSM;

- Restricting and anticompetitively impairing the ability of its rivals from competing with BCBSM's administrative services and stop-loss insurance products in Michigan, particularly because BCBSM's incremental increases in its Penalty Fee have disciplined its competitors into recognizing BCBSM as the market price leader, and further such competitors have been or know they will be targeted if they introduce new or innovative products designed to achieve lower prices and improve quality;

- Reallocating Michigan's total stop-loss product volume and/or market shares from what would otherwise have been the competitive equilibrium;

- Reducing any incentive of BCBSM's stop-loss rivals from engaging in price competition, as rivals are well aware that BCBSM can use its inflated revenue and profits gained from its Penalty Fee, and its control of the Relevant Markets, to fund any price war if rivals were to choose to engage in any serious price competition; and

- Raising barriers to entry in the Stop-loss Market as potential entrants could not be unaware of BCBSM's use of its Penalty Fee against its rivals.

### 1.  Substantially foreclosing competition and creating an anticompetitive market in Michigan.

234.  As a direct and proximate result of BCBSM's monopoly power in the TPA Market and its adoption of the Penalty Fee within its ASO or ASC agreements for its TPA services, BCBSM has foreclosed a substantial share of competition in the Stop-loss Market (i.e., the tied good market).

235.  The first indication that BCBSM's imposition of its Penalty Fee is foreclosing a substantial amount of competition and commerce, particularly in the

Stop-loss Market, is that BCBSM's prices for its stop-loss insurance have increased and/or been higher than its rivals since imposing its Penalty Fee.

236.   As a result, BCBSM's revenue from its stop-loss insurance has increased between 2012 and 2022 as follows:

|  | **2012** | **2022** |
|---|---|---|
| Stop-Loss Premiums | $260,359,368 | $323,230,292 |

237.   The second indication that BCBSM's Penalty Fee is foreclosing competition and otherwise having an anticompetitive effect on the Relevant Markets is the steady maintenance of BCBSM's dominant market shares in the TPA Market since imposing its Penalty Fee on all of its self-funded customers.

238.   Lastly, and most importantly, even more evidence that BCBSM's Penalty Fee is foreclosing competition and having an anticompetitive effect on the Relevant Markets, including a substantial amount of commerce in the Stop-loss Market (i.e., the tied good market), is shown through a comparison of the loss ratio data between BCBSM and its rivals in the stop-loss industry, particularly *after* BCBSM implemented its Penalty Fee.

239.   As mentioned above, in the insurance industry, a loss ratio is an industry standard used to represent the ratio of losses to premiums earned by an individual carrier.[19]

240.   A loss ratio provides a quick assessment of how effectively an insurance company is managing its risk and pricing its products.

241.   The lower a loss ratio, the more profitable an insurer is because it is paying out less in claims relative to the amount of premiums they are collecting.

242.   Conversely, the higher the loss ratio, the less profitable an insurer is as it is paying out more in claims relative to the premiums it is collecting.

243.   There is an inverse relationship between a loss ratio and gross profit per premium dollar.   For example, a 30-percentage point decrease in a loss ratio mathematically translates to a 30-percentage point increase in gross profit per premium dollar.

244.   Since BCBSM implemented its Penalty Fee, BCBSM's loss ratio has been significantly lower (i.e., *better*) than any of its rivals.

245.   In 2009 and 2010—the years preceding BCBSM's adoption of its Penalty Fee—BCBSM's loss ratios were 83.1% and 79.5%, respectfully.

---

[19] Loss ratio = (insurance claims paid + loss adjustment expenses) / (total earned premiums).

246.   In 2011, 2012 and 2013—the years *after* BCBSM began implementing its Penalty Fee in all of its ASC agreements (new and renewal contracts)—it saw an immediate increase in its gross profit, as its loss ratio dropped to 66.8%, 62.8%, and 56.7%, respectfully.

247.   The inverse of such a decline in BCBSM's loss ratio equates to an almost 30%-point increase in gross profit per premium dollar for BCBSM after it introduced its Penalty Fee.

248.   As of 2022, BCBSM enjoyed a loss ratio of 64.4%. Compared to its top 5 rivals (who averaged a loss ratio of 74.3%) and the rest of the stop-loss insurance industry (who averaged a loss ratio of 84.1%), BCBSM is consistently "generating three times more profit than the average stoploss carrier, which is really tied back to [its] interface fees."[20]

249.   BCBSM could not maintain its price, profits, and loss ratio disparities described herein unless it had (and used) its monopoly and market power in the Relevant Markets.

---

[20] Bruce Shutan, *Steep Interface Fee Hikes*, THE SELF-INSURER (Sept. 2015), https://www.sipconline.net/files/Steep%20Interface%20Fee%20Hikes%20Draw%20Industry%20IRE%20by%20Bruce%20Shutan.pdf.

      **2.**      **Weakening existing rivals' ability to compete with lower prices**.

250.  BCBSM's anticompetitive Penalty Fee targets its stop-loss rivals and weakens their ability to compete with lower prices.

251.  In particular, BCBSM's Penalty Fee forces rivals to discount their prices of stop-loss insurance to compensate consumers for the Penalty Fee imposed by BCBSM, which is essentially a departure tax that needs to be paid to BCBSM.

252.  This fact alone is demonstrative of BCBSM's Penalty Fee having an anticompetitive effect as its rivals' lower prices are not the result of free and open market forces but rather are the expected result of BCBSM imposing its Penalty Fee—a result that fully intended by BCBSM.

253.  Indeed, as explained *supra* (paragraphs 221-222), BCBSM's Penalty Fee is non-trivial. A self-funded customer with 500 members could result in a $48,000 ***a year*** penalty.

      **3.**      **Raising rivals' costs**.

254.  In a similar vein, BCBSM's anticompetitive conduct, as alleged throughout this Complaint, also effectively results in its rivals' costs being raised.

255.  Indeed, when rivals offer discounts to potential stop-loss customers who may attempt to depart from BCBSM, such rivals essentially assume the cost of BCBSM's Penalty Fee and must account for this increased surcharge in addition to their normal operating expenses.

      **4.    BCBSM's Penalty Fee has restricted and impaired competition; reallocated and disrupted the competitive equilibrium; and reduced any incentive of rivals from engaging in price competition as they have been (or know) they will be threatened with consequences.**

256. BCBSM's rivals in the Relevant Markets, and the self-insurance industry, are well aware of the "anticompetitive tendencies"[21] of BCBSM and recognize it as a market price leader.

257. According to one industry executive, BCBSM's Penalty Fee results in BCBSM "charging 24% [more than] the average stop-loss premium for a 2,000 life group that decides to purchase stop loss from another carrier" and more than "13% of premium for [a] 500" person group plan.[22]

258. More shocking is the "average profit-and-expense load for [a] typical stop-loss carrier is 20% in total" (i.e., a loss ratio of 80%) so "[i]n some instances, the penalty charged by [BCBSM via its Penalty Fee] is greater than the entire profit-and-expense load that exists in most stop-loss arrangements."[23]

259. Thus, industry insiders believe that BCBSM's Penalty Fee falls within the category of "becoming so exorbitant … that it's anti-competitive, unjustified and [outright] bad for the consumer."[24]

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

260.   Despite this, BCBSM rivals have attempted to engage in price competition, but BCBSM responded by immediately (and repeatedly) increasing its Penalty Fee to negate any price competition from occurring.

261.   For instance, in 2014 and 2015 the loss ratios for all stop-loss insurers increased as the overall stop-loss market failed to keep pace with an increase in medical claims for all self-funded employers. Thus, competition among stop-loss insurers was expected to increase.

262.   Fearing that self-funded TPA customers, such as Plaintiffs and the Class Members, might look elsewhere for stop-loss insurance to combat the rise of medical claims—BCBSM immediately took measures to preclude and deter further price competition from happening.

263.   Specifically, starting on or around 2015, BCBSM began increasing its Penalty Fee from $4 PCPM to $6 PCPM, or to a variable rate of $4 min to max $8 PCPM.

264.   When such price increases were not enough to stave off the competition that occurred in the Stop-loss Market between 2015-2018, BCBSM took the extraordinary step of imposing a $8 Penalty Fee on most of its self-funded TPA customers on a PCPM basis.

265.   As a direct and proximate result of this excessive hike of BCBSM's Penalty Fee, and its clear signal to the market that BCBSM will not tolerate its rivals' attempts at engaging in normal competition, BCBSM has achieved several things.

266.   *First*, BCBSM has slowed (and reversed) its rivals from increasing their market shares in the Stop-loss Market.  As a result, BCBSM's Penalty Fee has reallocated Michigan's total stop-loss product volume and/or market shares from what would have otherwise been a competitive equilibrium.

267.   *Second*, consistent with the same effects after BCBSM first introduced its Penalty Fee, its subsequent price hikes near 2015 and more recently post-2018 have resulted in BCBSM significantly growing its gross profit per premium dollar in comparison to its competitors.

268.   Specifically, after BCBSM's loss ratio increased from 2013 (57%) to 2015 (76%) with the corresponding increase in the cost for medical claims that all competitors experienced, BCBSM's loss ratio immediately began declining in 2016 (75%) and ultimately declined to 62.5% as of 2023, which is significantly better than any of its rivals and the national average for stop-loss insurers.

269.   BCBSM rivals are well aware of this, and that BCBSM can use such inflated revenue and profits gained from its Penalty Fee and its control of the Relevant Markets to fund any price war if rivals were to choose to engage in any serious price competition.

270.   *Lastly*, threatened by BCBSM's ongoing proclivity to engage in anticompetitive conduct and the unavoidable tax BCBSM is imposing on the Stop-loss Market in Michigan, BCBSM's competitors understandably have no incentive to engage in the competitively aggressive pricing that would (and should) be a characteristic of the Stop-loss Market in Michigan.

271.   Accordingly, BCBSM's Penalty Fee has no procompetitive benefits at all, let alone benefits that could outweigh the foregoing substantial anticompetitive effects.

### 5.      Raising Entry Barriers.

272.   BCBSM's loss ratio averaged approximately 62% between 2019 – 2023.

273.   During the same time period, the average loss ratio throughout the U.S. was approximately 79%.

274.   Economic logic would lead one to expect that BCBSM's uniquely low loss ratios (i.e., high gross profit rates) would have attracted competitors to enter the Michigan's Stop-loss Market.

275.   But no significant competitor entered during the 2019-2023 time period.[25]

---

[25] In this instance, "significant" refers to a competitor obtaining more than a 1.5% market share from 2019 to 2023.

276.  Rather, BCBSM's imposition of its Penalty Fee on each of its self-funded TPA customers has not only precluded such customers from going elsewhere for stop-loss insurance but has reduced the incentive of any stop-loss rivals' from entering the Stop-loss Market.  In other words, BCBSM has raised the barriers of entry into the Stop-loss Market.

## H.   BCBSM'S PENALTY FEE CAUSED ANTITRUST INJURY AND DAMAGES TO PLAINTIFFS AND THE CLASS.

277.  By imposing an excessive and exorbitant Penalty Fee on all Self-Funded Accounts that opt to purchase stop-loss insurance from a carrier other than BCBSM when BCBSM serves as the customer's TPA, BCBSM's Penalty Fee anticompetitively and artificially impairs the ability of actual or potential stop-loss insurance providers from competing with BCBSM's stop-loss insurance products in Michigan.

278.  Likewise, BCBSM's Penalty Fee has impaired the ability of Self-Funded Accounts, like Plaintiffs and the Class Members, from obtaining administrative services and stop-loss insurance of the highest quality, and at the most competitive price.  Rather, Plaintiffs and the Class Members are charged artificially higher prices or charged BCBSM's actual Penalty Fee.

279.  Accordingly, BCBSM's continuing violations of federal, and state, antitrust laws as described in this Complaint have caused (and continue to cause) antitrust injury to Plaintiffs and the proposed Class.

280. In particular, each time BCBSM has committed an overt act in continuance of carrying out its anticompetitive conduct described herein—such as by executing a new agreement or Schedule A with Plaintiffs or the Class Members that imposes the Penalty Fee, receiving payment under such agreements, or being paid the Penalty Fee itself (among any other overt acts)—BCBSM has inflicted a new and/or accumulating injury on Plaintiffs and the Class Members, which constitutes a repeated and continuous violation of federal and state antitrust laws.

281. Plaintiffs' injuries are the type that the antitrust laws were intended to prevent, and directly and proximately flow from BCBSM's actions and agreements that are unlawful under the antitrust laws.

282. More specifically, Plaintiffs injuries flow from BCBSM's violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 2 of the Michigan Antitrust Reform Act, MCL 445.772, through its imposition of its Penalty Fee provision in its ASO or ASC agreements when providing TPA services.

283. As a result of such violations, Plaintiffs and the Class Members seek to recover treble the amount of monetary damages resulting from BCBSM's anticompetitive conduct, including but not limited to, actual damages suffered by Plaintiffs and the Class Members in paying artificially inflated and/or higher prices for stop-loss insurance, and/or damages determined by the inflated profit BCBSM received by being paid the Penalty Fee.

284. Furthermore, Plaintiffs and the Class Members seek injunctive relief to enjoin BCBSM from engaging in the anticompetitive conduct alleged herein, and recovery of all costs and attorneys' fees as permitted by the Sherman Act, Clayton Act, and MARA, among any other remedies that this Court finds proper and just.

## I. CLASS REPRESENTATION ALLEGATIONS.

285. Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following class (the "Class"):

> All Self-Funded Accounts that have, since November 8, 2020: (1) engaged BCBSM as their third-party administrator via an ASO or ASC agreement, purchased stop-loss coverage from a BCBSM rival, and paid the Penalty Fee; or (2) engaged BCBSM as their third-party administrator via an ASO or ASC agreement and purchased stop-loss insurance coverage from BCBSM.

286. Plaintiffs reserve the right to amend or modify this class definition consistent with the record.

287. The putative class members' identities are readily ascertainable from BCBSM's records.

288. This action has been brought, and may properly be maintained, as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community interest in the litigation.

289. The prerequisites to class-representation pursuant to Rule 23(a) are present in this action as follows:

a. **Numerosity**. The members of the class are so numerous and geographically diverse that joinder of all of them is impracticable. The exact number and identities of members of the Class are unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery. However, Plaintiffs reasonably believe and therefore aver that there are hundreds of Class Members throughout the State of Michigan, particularly where BCBSM is known to serve as a TPA for many self-funded plans.

b. **Commonality and Predominance**. There are questions of fact and law common to the claims of Plaintiffs and the members of the Class that predominate over any questions affecting any individual member including, but not limited to, the following questions:

   i. Whether BCBSM has monopoly or market power demonstrated either through direct or indirect evidence in the Relevant Markets;

   ii. Whether BCBSM implemented contract provisions that unreasonably restrain trade by imposing its Penalty Fee on Plaintiffs and the Class, and otherwise tying and/or bundling its stop-loss insurance products to the purchase of BCBSM's TPA products and services;

   iii. Whether BCBSM's conduct and abuse of its market power has substantially foreclosed competition in the Relevant Markets, namely the tied product market;

   iv. Whether BCBSM's anticompetitive conduct continues to restrain trade and reinforce, maintain, or grow its market power;

   v. Whether Plaintiffs and the proposed Class have suffered injury caused by the alleged anticompetitive conduct of BCBSM;

   vi. Whether BCBSM's conduct violates 15 U.S.C. § 1; and

   vii. Whether BCBSM's conduct violates Michigan Antitrust Reform Act, MCL 445.771 *et seq*.

c. **Typicality**. Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and the other Class members have been injured by the same wrongful practices. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the other Class members' claims and are based on the same legal theories. Specifically, Plaintiffs and other members of the respective Class

are subject to the same or substantially similar form ASO or ASC agreement with BCBSM, purchased stop-loss insurance from BCBSM, and/or purchased stop-loss insurance from a third-party, and were subject to the same Penalty Fee in violation of federal and state antitrust laws. Plaintiffs and the other members of the Class seek identical remedies under identical legal theories, and there is no antagonism or material factual variation between Plaintiffs' claims and those of the respective Class.

    d. **Adequacy**. Plaintiffs will fully, fairly, and adequately assert and protect the interests of the other Class members. Plaintiffs' claims are coextensive with, and not antagonistic to, the claims of the other members of the Class where the claims are identical and any outcome, i.e., judgment in Plaintiffs' and the Class's favor, including awards of Fees or mandated action by BCBSM, in no way conflict. Plaintiffs are willing and able to vigorously prosecute this action on behalf of the Class, and Plaintiffs have retained counsel experienced and qualified in handling antitrust lawsuits, complex legal issues, and class actions, and neither Plaintiffs nor its counsel have any interests which might cause them not to vigorously pursue this action or that conflict with Class members' interests.

290. Plaintiffs bring this action under Rule 23(b)(1) and (b)(3) of the Federal Rules of Civil Procedure.

291. As to Rule 23(b)(1), adjudication by individuals in the Class raises a substantial likelihood of a risk of (i) inconsistent or vary adjudications with respect to individual members of the Class that would confront the party with incompatible standards of conduct; and/or (ii) adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Specifically, should any Self-Funded Accounts who

have engaged BCBSM via an ASO or ASC agreement be treated differently among different forums this would inevitably result in inconsistent or varying outcomes to the question of the legality of BCBSM's Penalty Fee that it imposes upon each self-funded customer via its ASO or ASC agreements and would therefore harm others in the Class.

292. As to Rule 23(b)(3), this class action is appropriate for certification because questions of law and/or fact common to the members of the Class predominate over questions affecting only individual members. Indeed, the predominant issues in this action include, but are not limited to, whether BCBSM implemented contract provisions that unreasonably restrain trade by imposing its Penalty Fee on Plaintiffs and the Class, and otherwise tying and/or bundling its stop-loss insurance products to the purchase of BCBSM's TPA products and services, and whether Plaintiffs and the proposed Class have suffered injury caused by the alleged anticompetitive conduct of BCBSM.

293. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and the smaller self-funded accounts are unlikely to raise these claims on their own.

294.   Absent a class action, some or all of the Class members may find the cost of litigating to be prohibitively high, particularly for those members who have smaller enrollment in their self-funded plans and therefore, would have no effective remedy at law.

295.   Further, should individual members of the Class be required to bring separate actions, courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. This class action presents fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

296.   The prosecution of the claims of the Class in part for injunctive relief, declaratory, or equitable relief, is also appropriate because BCBSM has acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

297.   Certification under Rule 23 of the Federal Rules of Civil Procedure is, therefore, appropriate because a class action is superior to the other available methods for the fair and efficient adjudication of this action, and Plaintiffs envision no unusual difficulty in the management of this action as a class action.

298.   Based on discovery and further investigation, Plaintiffs may, in addition to moving for class certification, use modified definitions of the class, class claims, and the class period, and/or seek class certification only as to particular issues as permitted under Rule 23.

## COUNT I:
## AGREEMENT IN RESTRAINT OF TRADE – SHERMAN ACT § 1

299.   Plaintiffs hereby repeat and reallege paragraphs 1 through 298, hereof, as if fully set forth herein.

300.   BCBSM's products, TPA services and stop-loss insurance, are separate products and are sold in separate markets.

301.   BCBSM has tied and/or bundled its stop-loss insurance products with the sale of its TPA products and services to Self-Funded Accounts, including Plaintiffs and the Class Members, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.   Specifically, BCBSM since in or around 2011 has required, and continues to require, that all of its TPA customers who have entered into ASO or ASC agreements, including Plaintiffs and the Class Members, agree via their ASO or ASC contracts with BCBSM to pay the Penalty Fee if they purchase stop-loss insurance from another carrier.   Such an agreement between BCBSM (as the seller) and its Self-Funded Account customers, like Plaintiffs and the Class Members, (as the buyers) is an unlawful agreement in restraint of trade.

302.   BCBSM has market power in the TPA Market and has used this power to condition the sale of TPA products and services on the purchase of stop-loss insurance from BCBSM, or else Plaintiffs and the Class Members are forced to pay the Penalty Fee.

303.   This tying and/or bundling arrangement has directly and proximately resulted in anticompetitive effects, particularly in the tied product market, including, but not limited to:

     a.   Substantially foreclosing open and free competition in Michigan's stop-loss insurance market by keeping BCBSM's actual or potential competitors' market shares at levels that are too low to constrain BCBSM from charging prices to self-funded customers at prices above that which would be tolerated in a competitive market;

     b.   Limiting and/or weakening price competition among BCBSM's rivals in the stop-loss insurance market and otherwise causing stop-loss insurance prices to be higher than would otherwise be expected in a competitive market;

     c.   Raising the costs of its rivals, as BCBSM's rivals assume the cost of BCBSM's Penalty Fee when servicing any stop-loss customers who migrate from BCBSM;

     d.   Restricting and anticompetitively impairing the ability of actual or potential rivals from competing with BCBSM's administrative services and stop-loss insurance products in Michigan, particularly because BCBSM's incremental increases in its Penalty Fee have disciplined its competitors into recognizing BCBSM as the market price leader, and further have been or know they will be targeted if they introduce new or innovative products designed to achieve lower prices and improve quality;

    e.  Reallocating Michigan's total stop-loss product volume and/or market shares from what would otherwise have been the competitive equilibrium;

    f.  Reducing any incentive of BCBSM's stop-loss rivals from engaging in price competition, as rivals are well aware that BCBSM can use its inflated revenue and profits gained from its Penalty Fee, and its control of the Relevant Markets, to fund any price war if rivals were to choose to engage in any serious price competition;

    g.  Raising barriers to entry in the Stop-loss Market; and

    h.  Otherwise harming and unlawfully restraining competition in the stop-loss insurance market in Michigan.

304. BCBSM's conduct has a substantial effect on interstate commerce in the stop-loss insurance market.

305. There are no imaginable competitive benefits to weigh against the above anticompetitive effects of BCBSM's Penalty Fee imposed on Plaintiffs and the Class Members who chose and continue to choose to purchase stop-loss insurance from BCBSM's rivals. There is no competitive cost justification for BCBSM's Penalty Fee being charged on a per contract per month basis as its intent was simply to restrain competition and deter Plaintiffs and other Class Members from purchasing stop-loss insurance products from BCBSM's rivals.

306. Moreover, BCBSM's conduct was not intended to, nor did it have the effect of reducing the cost of TPA services or stop-loss insurance products or services.

307. As a direct and proximate result of BCBSM's continuing violations of

Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the Class have been injured in their business or property and have sustained actual damages, plus treble damages, and hereby further seek injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## COUNT II:
## UNLAWFUL AGREEMENT IN VIOLATION OF MCL 445.772 – MICHIGAN ANTITRUST REFORM ACT

308.   Plaintiffs hereby repeat and reallege paragraphs 1 through 307, hereof, as if fully set forth herein.

309.   BCBSM entered into contracts with Plaintiffs and the other Class members that unreasonably restrains and/or monopolizes trade and commerce in violation of Section 2 of the Michigan Antitrust Reform Act, MCL 445.772 within the Relevant Markets, namely the Michigan Stop-loss Market.

310.   Specifically, BCBSM has required, and continues to require, that all of its self-funded TPA customers, including Plaintiffs and the Class members, agree via their contracts with BCBSM to pay the Penalty Fee if they purchase stop-loss insurance from another carrier.  Such an agreement between BCBSM (as the seller) and its Self-Funded Account customers, like Plaintiffs and the Class Members, (as the buyers) is an unlawful agreement in restraint of trade.

311.   The tying and/or bundling of such products and services by BCBSM has not led, and likely will not lead, to lower costs for TPA and stop-loss insurance

70

products and services. Further, the subject matter of the products and services alleged herein are not the subject of a legislatively mandated pervasive regulatory scheme.

312. On the contrary, BCBSM's adoption of its Penalty Fee in its ASO or ASC agreements for TPA services, *inter alia*, was solely for the purposes of BCBSM to restrain and/or monopolize trade or commerce in Michigan's Stop-loss Market in violation of Section 2 of the Michigan Antitrust Reform Act, MCL 445.772.

313. As alleged throughout this complaint, BCBSM's tying and/or bundling contractual arrangement with Plaintiffs and the Class Members has resulted in anticompetitive effects within the relevant Stop-loss Market.

314. As a direct and proximate result of BCBSM's continuing violations of MCL 445.772, and pursuant to MCL 445.778(2), Plaintiffs and the members of the Class have standing to and do hereby seek monetary damages, plus treble damages for the flagrant violations committed by BCBSM, together with injunctive, declaratory, and other equitable relief, as well as attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Wesco and the UWUA Fund respectfully request that this Court enter judgment in their favor, and in favor of all others similarly situated in the Class, and against BCBSM as follows:

A. Certifying the proposed Class specified herein, designating the named Plaintiffs as class representatives and the undersigned counsel as class counsel, and allow Plaintiffs and the Class to have a trial by jury;

B. Finding that BCBSM has committed violations of the Sherman Act, Section 1 and the Michigan Antitrust Reform Act as alleged herein, and that Plaintiffs and the Class members have been damaged and injured as a result of these violations in an amount to be determined at trial;

C. Finding that BCBSM engaged in a contract, combination, or conspiracy in violation of 15 U.S.C. § 1 and MCL 445.772, and that Plaintiffs and the Class members have been damaged and injured as a result of these violations in an amount to be determined at trial;

D. Awarding Plaintiffs and the Class members all monetary damages sustained by reason of the antitrust violations alleged herein in an amount to be determined at trial;

E. Awarding treble damages to Plaintiffs and the Class members, pursuant to 15 U.S.C. § 15, and MCL 445.778(2);

F. Awarding Plaintiffs monetary damages, costs, interest, and attorneys' fees (including statutory attorneys' fees under state and federal antitrust laws) to the fullest extent of the law;

G. Awarding any and all injunctive relief to which Plaintiffs and the Class Members may be entitled, including but not limited to a preliminary injunction while this case is pending and/or a permanent injunction enjoining BCBSM from engaging in the anticompetitive conduct alleged herein; and

H. Awarding all other equitable, injunctive, or other relief to which Plaintiffs and the Class may be entitled.

Respectfully submitted,

VARNUM LLP
*Attorneys for Plaintiffs and Putative Class*

Dated: November 11, 2024          By: _____
Perrin Rynders (P38221)
Aaron M. Phelps (P64790)
Herman D. Hofman (P81297)
Justin M. Wolber (P85728)
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
prynders@varnumlaw.com
amphelps@varnumlaw.com
hdhofman@varnumlaw.com
jmwolber@varnumlaw.com

Lauren Crummel (P73333)
WATKINS, PAWLICK, CALATI & PRIFTI, PC
*Co-counsel for Utility Workers Union of
America National Health and Welfare Fund*
1423 E. Twelve Mile Road
Madison Heights, MI 48071
(248) 658-0797
lcrummel@wpcplaw.com

John W. Barrett (#568537)
Eric B. Snyder (*pro hac vice pending*)
BAILEY GLASSER
*Co-counsel for Plaintiffs and Putative Class*
1055 Thomas Jefferson St. NW, Suite 540
Washington, D.C. 20007
(304) 340-2287
JBarrett@baileyglasser.com
ESnyder@baileyglasser.com

26449183.11

73

## PLAINTIFFS' DEMAND FOR JURY TRIAL

Plaintiffs demand a jury on all issues triable by a jury set forth in their

Complaint.

Respectfully submitted,

VARNUM LLP
*Attorneys for Plaintiffs and Putative Class*

Dated: November 11, 2024        By: _____
Perrin Rynders (P38221)
Aaron M. Phelps (P64790)
Herman D. Hofman (P81297)
Justin M. Wolber (P85728)
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
prynders@varnumlaw.com
amphelps@varnumlaw.com
hdhofman@varnumlaw.com
jmwolber@varnumlaw.com

Lauren Crummel (P73333)
WATKINS, PAWLICK, CALATI & PRIFTI, PC
*Co-counsel for Utility Workers Union of*
*America National Health and Welfare Fund*
1423 E. Twelve Mile Road
Madison Heights, MI 48071
(248) 658-0797
lcrummel@wpcplaw.com

John W. Barrett (#568537)
Eric B. Snyder (*pro hac vice pending*)
BAILEY GLASSER
*Co-counsel for Plaintiffs*
1055 Thomas Jefferson St. NW, Suite 540
Washington, D.C. 20007

74

(304) 340-2287
JBarrett@baileyglasser.com
ESnyder@baileyglasser.com

## <u>APPENDIX – GLOSSARY OF TERMS</u>

"**BCBSM**" – means Blue Cross Blue Shield of Michigan Mutual Insurance Company, a nonprofit mutual disability insurer who operates under Chapter 58 of the Michigan Insurance Code, MCL 550.1101, et seq, with its principal place of business located at 600 E. Lafayette Blvd., Detroit, MI 48226, and its subsidiaries (e.g., Blue Care Network).

"**Class Member**" – is a member of the "Class" set forth in paragraph 289 of the Complaint.

"**Commercial Health Benefit Product**" – means any product or plan providing for the payment or administration of health care services (including but not limited to medical, pharmacy, dental, and vision products and services) or expenses through insurance, reimbursement or other similar healthcare financing mechanism for insured members (however funded, including fully insured or self-funded), but excludes any product or plan offered or paid for by the government, such as Medicare and Medicaid, or other alternative products not offered through private insurance (e.g., Medicare Advantage).

"**Commercial Health Insurance Plan**" – also known as a traditional or fully insured insurance plan, means any Commercial Health Benefit Product whereby the insurer, carrier, or health plan underwrites, insures, primarily assumes the financial risk and directly pays for the covered medical services, products, and costs incurred by the individual members of the plan in exchange for receiving a fixed premium.

"**Self-Funded Account**" – means any account, employer, health benefit plan, ERISA plan, non-ERISA plan, or group plan, including all sponsors, administrators, fiduciaries, and members thereof, that sponsors, purchases, subscribes to, is covered by, participates in, or is enrolled in a Self-Funded Health Benefit Plan. A Self-Funded Account includes any associational entities (e.g., trade associations, unions, multi-employer plans, etc.) and any affiliates or member entities who may be covered by, enrolled in, or included in the associational entity's Self-Funded Health Benefit Plan. For clarity, a Self-Funded Account who purchases a BCBSM Self-Funded Health Benefit Plan and BCBSM Stop-Loss Insurance remains a Self-Funded Account.

"**Self-Funded Health Benefit Plan**" – means a Commercial Health Benefit Product *other than* a Commercial Health Insurance Plan, whereby the sponsor,

76

purchaser, subscriber or enrollee primarily assumes the financial risk and directly pays for the covered medical services, products, and costs incurred by the individual members of the plan, including third-party administrative services (e.g., claims administration and adjudication services) and access to a health insurance company's provider network via an administrative services only ("ASO") contract, an administrative services contract ("ASC"), or other similar contractual arrangement.

"**Stop-Loss Insurance**" – means an insurance, reinsurance, or gap coverage insurance policy, including both aggregate and specific stop-loss coverage, whereby a commercial health insurance carrier (like BCBSM) insures, underwrites, issues, and assumes the financial risk for the health care services (including but not limited to medical, pharmacy, dental, and vision products and services) or expenses that exceed the identified and predetermined attachment point set forth in the applicable policy.